**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TARIQ TAHARAH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3801 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiff Tariq Taharah's ("Taharah") and Defendant Michael

J. Astrue's, Commissioner of the Social Security Administration ("the Commissioner"),[1] cross-

motions for summary judgment. Taharah appeals the determination of an Administrative Law Judge

("the ALL") that he is not entitled to receive disability insurance benefits under Title II of the Social

Security Act. *See* 42 U.S.C. §§ 416(i), 423. Having reviewed the pending motions, the submissions

of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the

opinion that Taharah's Motion for Summary Judgment (Docket Entry No. 9) should be granted, the

Commissioner's Motion for Summary Judgment (Docket Entry No. 10) should be denied, the ALJ's

decision denying benefits be reversed, and the case should be remanded, pursuant to sentence four,

to the Social Security Administration ("SSA") for further proceedings.

---

[1] Michael J. Astrue was appointed Commissioner of the Social Security Administration effective February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is accordingly substituted for Jo Anne B. Barnhart (former Commissioner) as the defendant in this matter.

## I.    *Background*

On October 14, 2003, Taharah filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability beginning on May 4, 2001, as a result of narcolepsy,[2] insomnia,[3] and affective/mood disorders, particularly depression[4] and anxiety.[5] (R. 25, 51).  After being denied benefits initially and on the reconsideration levels, Taharah requested an administrative hearing before an ALJ.  (R. 17, 38, 39, 41).

A hearing was held on August 10, 2005, in Houston, Texas, at which time the ALJ heard testimony from Taharah and Wallace Stanfill, a vocational expert ("VE").  (R. 17, 450-483).  In a decision dated October 21, 2005, the ALJ denied Taharah's application for benefits.  (R. 17-24). Taharah appealed the decision to the Appeals Council of the Social Security Administration's ("SSA") Office of Hearings and Appeals.  After considering additional evidence (*i.e.*, letter from counsel in support of review; psychological reports dated December 24, 2003, from Paula Haymond, Ed.D.; medical report dated July 22, 2005, from Robert Fayle, M.D.; and correspondence dated May 14, 2004, from the Department of Veterans Affairs), on October 6, 2006, the Appeals Council denied

---

[2]"Narcolepsy" is characterized by recurrent, uncontrollable, brief episodes of sleep, often associated with hypnagogic [occuring just before sleep] or hypnopompic [persisting after sleep] hallucinations, cataplexy, and sleep paralysis.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 860, 1178 (29th ed. 2000).

[3]"Insomnia" is the inability to sleep accompanied by abnormal wakefulness.  *See* DORLAND'S, *supra,* at 903.

[4]"Depression" refers to a mental state of depressed mood characterized by feelings of sadness, despair, and discouragement.  Depression ranges from normal feelings of "the blues"' through dysthymic disorder to major depressive disorder.  It in many ways resembles the grief and mourning that follow bereavement; there are often feelings of low self-esteem, guilt, and self-reproach, withdrawal from interpersonal contact, and somatic symptoms such as eating and sleep disturbances.  *See* DORLAND'S, *supra,* at 477.

[5]"Anxiety" is the fear of impending danger accompanied by restlessness, tension, rapid heart beat, and shortness of breath unattached to clearly identifiable stimulus.  *See* STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

Taharah's request to review the ALJ's determination. (R. 4-7). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Taharah filed this case on December 1, 2006, seeking judicial review of the Commissioner's denial of his claim for benefits. *See* Docket Entry No. 1.

## II.    *Analysis*

### A.    *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, Taharah was insured for benefits through the date of the ALJ's decision—*i.e.*, October 21, 2005. (R. 23). Consequently, to be eligible for disability benefits, Taharah must prove that he was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

3

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

**B.**     *Standard of Review*

1.     *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

4

## 2. *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve. *Id*.

## C. *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

5

2.  An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. § 404.1520(e).

5.  If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340,

6

343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed

disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209

F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see*

*also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving

significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also*

20 C.F.R. § 404.1572(a)-(b).

　　A medically determinable "physical or mental impairment" is an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165

(5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C.

§ 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which

the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired

if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C.

§ 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's narcolepsy, hepatitis C,[6] degenerative disc disease[7] and depression are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity to perform a light level of work activity.  Specifically, the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently with a sit/stand option and the ability to walk 4 to 8 hours.  The ability to push and pull is unlimited.  Gross dexterity is unlimited but fine dexterity is limited.  The claimant retains the ability to relate to others, to understand simple instructions, concentrate on and perform simple tasks and respond to workplace changes and supervision. However, the claimant should have limited employee/customer contact.

7.    The claimant is unable to perform any of his past relevant work (20 C.F.R. § 404.1565).

(R. 23).  As to the fifth step, the ALJ concluded:

8.    As of his alleged onset date the claimant was a younger individual.  The claimant attained age 50 in September . . . 2005, which is considered an individual closely approaching advanced age (20 CFR § 404.1563).

9.    The claimant has a "high school equivalent education" (20 CFR § 404.1564).

---

[6]"Hepatitis" refers to an inflammation of the liver.  *See* DORLAND'S, *supra*, at 807.  "Hepatitis C" refers to a viral disease caused by the hepatitis C virus, the most common form of post transfusion hepatitis; it also follows parenteral drug abuse and is a common acute sporadic hepatitis, with approximately 50 per cent of acutely infected persons developing chronic hepatitis.  *See id.* at 808.

[7]"Degenerative disc disease" refers to a degeneration or deterioration of the circular flat plates which extend from the axis to the sacrum.  *See* DORLAND'S, *supra*, at 465, 510-511.

10.     The claimant has no transferable skills from any past relevant work (20 C.F.R. § 404.1568).

11.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rules 202.14 and 202.21, Appendix 2, Subpart P, Regulations No. 4, as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include work as a mail clerk, a parking lost attendant, and an electronics worker.

12.     The claimant is not under a "disability," as defined by the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(g)).

(R. 23-24).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Taharah's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

        **D.    *Issues Presented***

Taharah argues that the decision of the ALJ is not supported by substantial evidence. Specifically, Taharah claims that:  (1) the ALJ failed to properly develop and weigh the evidence

provided by his treating physician; (2) the ALJ did not give appropriate deference to the decision of

an independent examining psychiatrist; (3) the ALJ failed to give sufficient weight to the rating by

the Department of Veterans Affairs ("VA") that he is 100% disabled; and (4) the ALJ did not

acknowledge or grant any weight to the Global Assessment of Functioning ("GAF")[8] ratings

rendered by various doctors. *See* Docket Entry No. 9. The Commissioner disagrees with Taharah's

contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket

Entry No. 10.

E.   ***Review of ALJ's Decision***

1.   ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of

the claimant's impairment is compared to a list of impairments presumed severe enough to preclude

any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually

working and his impairments match or are equivalent to one of the listed impairments, he is

presumed to be disabled and qualifies for benefits without further inquiry. *See id*. at 532. When a

claimant has multiple impairments, the Act requires the Commissioner to "consider the combined

effect of all of the individual's impairments without regard to whether any such impairment, if

considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d

378, 393 (5th Cir. 2000). The relevant regulation similarly provides:

---

[8]A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms. *See id*. at 34.

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id*.  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 404.1526(a).  The applicable regulation further provides:

11

    (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

        (A)    You do not exhibit one or more of the medical findings specified in the particular listing, or

        (B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

    (ii)    We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 404.1526(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 257 (5th Cir. 1993); 20 C.F.R. § 404.1527(e).

    A review of the medical records submitted in connection with Taharah's administrative hearing reveals that Taharah has an extensive medical history dating back to June 2000. That month, Nicholas P. Poolos, M.D. ("Dr. Poolos"), a physician at the VA Hospital, met with Taharah. (R. 195). Dr. Poolos refilled Taharah's Ritalin[9] prescription but stated that Taharah would be given no further refills until he returned to the neurology clinic. (R. 195-196). Based on Dr. Poolos' notes, Taharah had not been to the neurology clinic since October 1999. (R. 195).

    In July 2000, Taharah met with Murthy Mutyala, M.D. ("Dr. Mutyala"), at the VA Hospital for a primary care follow-up visit. (R. 196). Dr. Mutyala noted that Taharah had a history of narcolepsy and was being treated with Ritalin. (R. 196). Taharah complained of a loss of appetite

---

    [9]"Ritalin" is a mild central nervous system stimulant used for the treatment of attention deficit disorder and narcolepsy. *See* PHYSICIANS' DESK REFERENCE ("PDR") 2269 (60th ed. 2006).

and requested food supplements.  (R. 196).  According to Dr. Mutyala, Taharah appeared "[a]lert [and] well oriented" and not in any acute distress.  (R. 196).  Later that day, Taharah visited Nancy W. Baker, R.D. ("Baker"), a registered dietician at the VA Hospital, complaining of insomnia, anorexia, and fatigue.  (R.197).  At that time, Taharah was 71" tall and weighed 141.5 pounds, which, according to Baker, was at the low end of his ideal body weight range of 141.3 - 172.7 pounds.  (R.197).  Taharah desired to gain 10 more pounds.  (R.197).

In August 2000, Taharah met with Katherine Noe, M.D. ("Dr. Noe"), a neurologist at the VA Hospital.  (R. 199).  Dr. Noe noted that "since [he was a] teenager [he] has had [symptoms] of loud snoring, restless and unrefreshing sleep, restlessness in the legs at sleep onset, leg kicking during sleep, difficulty falling asleep, excessive daytime sleepiness with uncontrollable sleep attacks, cataplexy[10] with strong emotions of anger, but not [with] strong positive emotions" along with "sleep paralysis on awakening in the morning."  (R. 199).  Dr. Noe further noted that 2-3 years earlier, Taharah had been diagnosed with narcolepsy and had been taking Ritalin.  (R. 199).  Taharah, however, complained about the "highs and lows from [R]italin," and as a result "he sometimes takes half [a tablet] if he is feeling more awake."  (R. 199).  Dr. Noe indicated that "his [symptoms] are well controlled on current medication" and he "is reluctant to change his medication at present, because he cannot afford to take time off work."  (R. 199).

In September 2000, Taharah met with Swaroop Avn Reddy, M.D. ("Dr. Swaroop Reddy"), at the VA Hospital, complaining of pain around his kidneys.  (R. 200).  Dr. Swaroop Reddy noted that Taharah had a history of kidney stones and had an appointment to meet with his primary care

---

[10]"Cataplexy" is defined as a condition in which there are abrupt attacks of muscular weakness and hypotonia triggered by an emotional stimulus such as mirth, anger, fear, or surprise.  It is often associated with narcolepsy.  *See* DORLAND'S, *supra,* at 296.

physician in 10 days.  (R. 200).  Dr. Swaroop Reddy sent Taharah to the lab for a liver panel and noted that Taharah had previously tested positive for hepatitis C.  (R. 200).

In October 2000, Dr. Mutyala noted that he would refer Taharah to the hepatitis C clinic at the VA Hospital.  (R. 202).  Dr. Mutyala reported that Taharah appeared well oriented and not in any acute distress.  (R. 202).

In January 2001, Taharah again met with Dr. Mutyala for a follow-up appointment.  (R. 202).  Taharah did not have any new complaints at that time.  (R. 202).  Dr. Mutyala noted that Taharah was a "veteran [with a history of] insomnia when he was in service [and he] was discharged [after] 6 [months] of service because of his sleep problem."  (R. 202).

In March 2001, Taharah met with Sharon Hartman, M.D., ("Dr. Hartman"), at the VA Hospital.  (R. 204).  Taharah told Dr. Hartman that he was still having difficulty waking up in the mornings and frequently overslept work and was in danger of losing his job because of this.  (R. 204).  He had recently been placed on Serax for insomnia at night and to help regulate his sleep cycle.  (R. 204).  Taharah stated that as a result of the medication, his symptoms are well controlled with no more sleep or drop attacks.  (R. 204).  Dr. Hartman suggested some behavioral modification techniques to combat insomnia instead of medication, but Taharah was reluctant to try these because they had not worked in the past, and as a result, he would oversleep for work the next day.  (R. 204).  Dr. Hartman was concerned that Taharah had such significant component of insomnia, which is not usually a predominant feature of narcolepsy.  (R. 205).

In April 2001, Michael J. Vickers, M.D. ("Dr. Vickers"), noted that Taharah had "questionable narcolepsy."  (R. 206).  Later that month, Taharah met with a social worker, Elizabeth R. Sjouji ("Sjouji") at the VA Hospital.  (R. 207).  She reported that Taharah appears to perceive that

he is unemployable and may be eligible for non-service connected pension.  (R. 207).  Sjouji further

noted that Healthcare for Homeless Veterans was unable to assist with Taharah's claim for a non-

service-connected pension, but appropriate referrals were provided."  (R. 207).

In May 2001, James Smith ("J. Smith"),a nurse at the VA Hospital, noted that Taharah's

diagnosis of narcolepsy in a sleep center follow-up report.  (R. 209).  J. Smith indicated that Taharah

had initially been diagnosed with narcolepsy in August 1994 at the Diagnostic Center Hospital.  (R.

209).

In June 2001, Taharah again met with Dr. Hartman at the VA Hospital.  (R. 213).  Taharah

complained of a decreased appetite and continued insomnia.  (R. 213).  Later that month, Taharah

told Linda Kilgore, R.N. ("Kilgore"), a nurse at the VA Hospital, that he felt depressed.  (R. 216).

They discussed the impact of narcolepsy on his life, including the fact that he was unable to maintain

employment.  (R. 216).  Kilgore then discussed the case with Timothy L. Bayer, M.D. ("Dr. Bayer"),

who proscribed Taharah antidepressants.  (R. 216).  Kilgore opined that Taharah's employment and

health problems may affect the diagnosis, treatment, and prognosis of any mental disorders.

(R. 216).

In July 2001, Taharah told Dr. Mutyala at the VA Hospital that he had a regular routine of

adequate exercise.  (R. 218).  Dr. Mutyala opined that Taharah was not able to work because of

narcolepsy, insomnia, and depression.  (R. 218).  P. Jay Foreman, M.D. ("Dr. Foreman"), of the VA

Hospital, also noted that the sleep clinic at the VA Mental Health Services agreed with the

narcolepsy diagnosis.  (R. 218).  Dr. Foreman recommended Ritalin but no further sedative or

hypnotics.  (R. 218).  Dr. Foreman reported that Taharah told him that he sleeps through two alarm

clocks and telephone calls and he is unable to hold a job due to his a.m., excessive daytime

sleepiness, and is becoming quite depressed about the situation.  Taharah believed that the only way to go to sleep earlier was with sleeping pills.  (R. 219).

A few weeks later, Taharah advised nurse J. Smith that his alertness had improved but he had difficulty with cataplexy at night, and he complained that his insomnia was worse since stopping his bedtime dose of Benzodiazepine.[11]  (R. 223).  Taharah's medication was adjusted, changing his Ritalin schedule and adding Prozac[12] to combat the cataplexy.  (R. 223).

In August 2001, Taharah reported to J. Smith  that he had improved daytime alertness and no daytime sleep attacks since starting on Prozac, but he still had insomnia at night and difficulty waking up in the morning.  (R. 230).  Later that month, Taharah told social worker Andrea Carter ("Carter") at the VA Hospital that his anxiety and fear were escalated because of his hepatitis C diagnosis.  (R. 225).  Taharah also told  Jacquelyn Olson ("Olson"), a nurse at the VA Hospital, that he was upset because he had trouble sleeping at night due to his sleep medication being decreased.  (R. 227).  Taharah met with Stephanie Sim, M.D. ("Dr. Sim"), at the VA Hospital.  (R. 226).  Taharah told Dr. Sim that he had cut back on his coffee and although he felt tired when he got home, he remained unable to fall asleep.  (R. 226).  Taharah complained of feeling depressed with decreased sleep, energy, and interest in life.  (R. 226).  At that time, Taharah had recently lost his job and was experiencing financial difficulties, and Dr. Sim noted that Taharah seemed overwhelmed with life stressors as well.  (R. 226).  Dr. Sim advised Taharah not to take Ritalin after Noon because

---

[11]"Benzodiazepine"  is a tranquilizer with antianxiety, sedative, hypnotic, amnestic, and muscle relaxing effects.  *See* DORLAND'S, *supra,* at 204.

[12]"Prozac" is a psychotropic drug indicated for the treatment of major depressive disorder and panic disorder.  *See* PDR, *supra,* at 1803.

it could contribute to his insomnia, and she recommended further treatment for his depression, particularly psychotherapy.[13]  (R. 226).

In October 2001, Taharah told S. Tavakoli-Tabasi, M.D. ("Dr. Tavakoli-Tabasi") that he had to quit working as a crane operator because he was not able to wake up at 6 a.m. every day, which was necessary for his job.  (R. 235).  Dr. Tavakoli-Tabasi listed unemployment, narcolepsy, and osteoarthritis[14] as current problems for Taharah.  (R. 235).

In November 2001, Taharah was seen by Lois H. Riccard ("Riccard"), L.V.N., a nurse at the VA Hospital.  (R. 241).  Taharah complained that since he was taken off of his sleep medication, he has had insomnia.  (R. 241).  Taharah reported that he sleeps from 2:00 a.m. to 9:00 a.m., causing him to be depressed and agitated.  (R. 241).

In December 2001, Taharah told nurse J. Smith that he smoked a pack of cigarettes a day and had done so for the last 25-years.  (R. 242).  J. Smith advised Taharah to try exercising during the day and to stop ingesting nicotine and caffeine because the attending physician had recommended better sleep hygiene to treat Taharah's insomnia.  (R. 242).

Notes from the VA Hospital dated March 2002, report that Taharah "[h]as been on [R]italin for 5-6 [years] . . . which has been beneficial."  (R. 243).  Later that month, Taharah again met with nurse J. Smith.  (R. 253).  Taharah stated that he was taking Ritalin to combat his narcolepsy, but was having difficulty with nighttime insomnia and "doesn't feel he is doing well overall."  (R. 253).  J. Smith reported that Taharah admitted that he does worse under stressors and wanted to stop all

---

[13]"Psychotherapy" involves treatment of mental disorders using verbal and nonverbal communication in order to alter maladaptive patterns of coping, and relieve emotional disturbance. Psychotherapy is usually contrasted with therapies involving physical interventions, such as drug . . . therapies." *See* DORLAND'S, *supra,* at 1489.

[14]"Osteoarthritis" is a noninflammatory degenerative joint disease seen mainly in older persons. The condition is accompanied by pain and stiffness. *See* DORLAND'S, *supra,* at 1286.

medication for awhile because he was "tired of taking it," but knew that he would continue to suffer narcolepsy symptoms if he did not.  (R. 253).  At that time, Taharah had recently been given an eviction notice from his apartment.  (R. 253).

In May 2002, Taharah met with Melissa Lockhart ("Lockhart"), a nurse at the VA Hospital. (R. 256).  Lockhart noted that Taharah's homelessness, lack of employment, and lack of a proper support structure may affect the diagnosis, treatment, and prognosis of any mental disorders he may have.  (R. 256).  At that time, Taharah's GAF was rated as 60;[15] he was instructed him to go to the Veteran Employment Center for help finding a job.  (R. 256).  Two days later, Taharah met with Charles M. Shaw, M.D. ("Dr. Shaw"), a staff psychiatrist, and Jacquelyn L. Starks, R.N. ("Starks"), a nurse, at the VA Hospital.  (R. 257).  Taharah complained of symptoms of "decreased sleep, because he is sleeping in [a] vacant apartment."  (R. 256).  Although Taharah had recently be prescribed an antidepressant, he reportedly never took it.  (R. 256).  Taharah's affect was noted as "somewhat angry and irritable" while his thoughts were goal directed and somewhat illogical. (R. 256).  He admitted to suicidal and homicidal ideations "without a plan or past attempt."[16] (R. 256).  Post Traumatic Stress Disorder ("PTSD")[17] was ruled out and Taharah was assigned a

---

[15]A GAF rating of 51-60 indicates "moderate" symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers).  *See* DSM-IV-TR, *supra*, at 34.

[16]Dr. Shaw noted that "[Taharah's] suicidal and homicidal verbalizations occurred exclusively in a manipulative context and he disavowed any intent.  In my opinion, he is not an imminent danger to himself or others."  (R. 257).

[17]"Post-traumatic stress disorder" is an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating. The onset of symptoms may be delayed for months to years after the event.  *See* DORLAND'S, *supra,* at 531.

GAF score of 55.  (R. 257).  Later that month, Taharah again met with nurse J. Smith to discuss the

Trauma Recovery Program, at which time J. Smith noted that PTSD had been ruled out.  (R. 258).

In June 2002, Taharah met with Sandhya Trivedi, M.D. ("Dr. Trivedi"), a psychiatrist, and

Kristie Yeagley ("Yeagley"), a social worker, at the VA Hospital for a Psychiatry Diagnostic

Assessment.  (R. 245).  Taharah stated that he could not keep daily habits and that he had

uncontrollable depression because he was unable to get on a medication schedule.  (R. 263).

Taharah admitted to smoking 1-2 packs of cigarettes a day, and drinking 4 cups of coffee a day.

(R. 246).  It was reported that Taharah "had been taking Ritalin [and] also a [benzodiazepine] and

other sleeping pills for nighttime insomnia.  He said he earned $44000 for the first time in 2000 on

this combination.  These [medications] were stopped and he deteriorated."  (R. 248).  Dr. Trivedi

noted that the VA's "Report of Separation" indicated that Taharah was "not fit for duty," but no

documentation was provided with additional information.  (R. 265).  It was further reported that

Taharah preferred being alone, with no overt longing for others, was excessively self-centered, and

he exhibited pervasive irresponsibility towards others.  (R. 245).  It was noted that Taharah had a

poor work history.  (R. 264).  According to Taharah, he usually left a job because of "[a]rriving late

to work and sleeping on the job due to narcolepsy."  (R. 264).

Dr. Trivedi noted that Taharah alleged that he could not fall asleep at night because of the

stimulants he had to take to stay awake during the day, and once he fell asleep, he allegedly awoke

too late to make it to jobs requiring him to be there early.  (R. 248).  It was noted that Taharah was

"marginally cooperative," and his lowest GAF score in the week prior to meeting with Dr. Trivedi

was 35.[18]  (R. 245).  Dr. Trivedi recommended that Taharah not be enrolled in the Trauma Recovery

---

[18]A GAF rating of 35 indicates some impairment in reality testing or communication (*e.g.*, speech
is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school,

Program because, in his opinion, Taharah's primary diagnoses are not in the anxiety disorders realm, but he does have significant depression and narcolepsy.  (R. 245).  Taharah claimed that he was discharged from the military for "unknown reasons," but it may have been because he was caught sleeping on guard duty.  (R. 265).  Dr. Trivedi reported that Taharah shared that the harassment that he endured when he was discharged early from the Army was traumatic for him and he has filed a service-connected claim regarding this for PTSD.  (R. 265).  Dr. Trivedi advised Taharah that the word "trauma" in PTSD is for life threatening events, but he refused to be educated on the diagnosis and was adamant that he has PTSD.  (R. 265).

In July 2002, Dionisio Alquiza, M.D. ("Dr. Alquiza"), a psychiatrist with the VA Hospital wrote in a Mental Health Assessment note that Taharah:

> [R]eports being depressed for [several] years, stating that he came out depressed from his 6 [months] of military service.  He alluded to the humiliation he received as well as his abrupt discharge as the inciting factors that led to his depression . . . .  He said this depression subsided after he moved/found work in Houston, and joined a religious group, although he [continued] to have sporadic spells of depression, about 6 [times a] year.  He said his depression has been persistent in the past year, as it can last [a] couple of weeks, and blames this on his life situation, of homelessness, unemployment and difficulty getting help.  The depression is associated with difficulty functioning, decreased motivation/interest, anhedonia,[19] poor appetite, [isolation] – not wanting to talk or socialize, sometimes feels hopeless/worthless, and [though he] wishes he was dead [he] denies ever [contemplating] suicide due to his [religious] beliefs.

(R. 267-268).  Taharah told Dr. Alquiza that narcolepsy and unemployment contributed to the divorce of his first marriage.  (R. 269).  Dr. Alquiza reported that Taharah's history was self-

---

family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* DSM-IV-TR*, supra*, at 34.

[19]"Anhedonia" involves a total loss of feeling of pleasure in acts that normally give pleasure.  *See* DORLAND'S*, supra,* at 89.

contradictory on several occasions and Taharah had difficulty answering questions directly. (R. 268).   Dr. Alquiza noted that, while Taharah was cooperative, he gave Dr. Alquiza the impression that his depression symptoms were magnified, as he did not look overly dysphoric. [20] (R. 269).   Taharah's mood was described as depressed with "no overt psychosis."  (R. 269).   Dr. Alquiza assigned Taharah a GAF score of 50.[21]   (R. 269).   Later that month, Taharah's treating physician, Gerald Busch, M.D. ("Dr. Busch") reported that Taharah thinks about the murder of his Army Captain every time something reminds him of the military.  (R. 379).

In August 2002, Dr. Busch noted that Taharah was exposed to trauma in 1974 when Taharah's Army Captain was mutilated and killed in his barrack.  (R. 379).  Later that month, Clydie Smith ("C. Smith"), a nurse at the VA Hospital, noted that Taharah's weight based on his height was in the acceptable range of the Body Mass Index.  (R. 271).

In September 2002, Dr. Alquiza noted that Taharah continued to complain about his sleep problems.  (R. 285).  Dr. Alquiza reported that Taharah took his sleeping medication inconsistently, but when he took the medication he was able to sleep.  Taharah told Dr. Alquiza that if he did not take the medication, he was unable to sleep and was unable to function the following day.  Taharah reported no side effects from medications.  (R. 285).  Taharah told Dr. Alquiza that he felt "blue" once or twice a month for a couple of days.  (R. 272).  Dr. Alquiza noted that Taharah gave the impression that he exaggerated his symptoms and that while Taharah stated that he was "depressed at times," he appeared to be neither depressed nor manic.  (R. 272).  Dr. Alquiza assigned Taharah

---

[20]A "dysphoric" mood is characterized by disquiet or restlessness as well as vague feelings of bodily discomfort and fatigue.  *See* Dorland's, *supra*, at 556, 1049.

[21]A GAF rating of 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See* DSM-IV-TR, *supra*, at 34.

a GAF score of 50.  (R. 285).  Dr. Alquiza encouraged Taharah to take his medication as directed to help with his sleep cycle and mood stabilization and stressed the importance of developing good sleep hygiene, including no naps, no caffeine before bedtime, waking/sleeping at same time daily, and no smoking.  (R. 285).

In January 2003, Taharah visited with Samjot Singh Dhillon, M.D. ("Dr. Dhillon"), at the VA Hospital.  (R. 305).  Dr. Dhillon noted that Taharah was no longer taking Prozac, but was taking the antidepressant Mirtazapine and had not experienced any cataplexy episodes.  (R. 305).  Dr. Dhillon strongly cautioned Taharah not to take any sedatives like Benadryl.  (R. 305).  Taharah agreed not to take any sedatives.  (R. 305).

In May 2003, Kevin Q. Nguyen, M.D. ("Dr. Nguyen"), of the VA Hospital, noted that Taharah appeared well nourished, and although Dr. Nguyen could not order Ensure, he referred Taharah for a dietary supplement.  (R. 307).  Dr. Nguyen noted that Taharah complained of issues with his depression not being under control and had even contemplated suicide.  (R. 307).  Dr. Nguyen informed Taharah that he had tested positive for hepatitis C in October 2001;[22] Taharah was unaware of this diagnosis and was reportedly visibly upset by the news.  (R. 307).  Dr. Nguyen also referred Taharah to the mental health clinic for his depression and to the sleep clinic to address whether Taharah could start taking Concerta.[23]  (R. 307).  Dr. Nguyen noted that, at that time, Dr. Busch had prescribed Concerta to Taharah.  (R. 307).

_____

[22] Other medical records reflect that Taharah had tested positive for hepatitis C antibodies as early as September 2000.  (R. 200)

[23] "Concerta" is indicated for the treatment of attention deficit hyperactivity disorder.  *See* PDR, *supra*, at 1803.

Also in May 2003, Taharah met with Tanya E. Williams ("Williams"), a nurse at the VA Hospital.  (R. 291).  It was noted that Taharah was complaining of depression, stating that he was irritable, isolative, and had no social life because he only received $800 per month.  (R. 291). Taharah reported that he felt like less of a man as a Muslim who should be the "bread winner." (R. 291).  Taharah was upset that, upon evaluation for the Trauma Recovery Program, he was told that he did not have PTSD.  (R. 291).  Williams noted that Taharah exhibited the "poor me syndrome" and Taharah was circumstantial and believed that the system is against him.  (R. 291). Taharah was assigned a GAF score of 50, and his antidepressant medication, Mirtazapine, was increased.  (R. 291, 309).

In June 2003, Baker, a dietician, noted that although Taharah was at a healthy weight based on his Body Mass Index, and that he had lost almost 7 pounds or 5% of his body weight since his last visit in May 2003.  (R. 293).  She noted that medication decreases his appetite, and as a result, he only eats one meal in the evening.  (R. 312).  She recommended that he eat 4 to 6 small meals or snacks a day and to stop skipping meals.  (R. 312).  That same day, Taharah met with nurse C. Smith at the VA Hospital.  (R. 296).  She noted that he had symptoms of depression and a history of presenting himself as preoccupied with his past woes.  (R. 296).  Taharah asserted that medicine was not going to change his life, which he claimed had been "messed up for the past 30 years." (R. 296). Taharah stressed that he felt cheated by the military out of his benefits and he felt slighted and invalidated by his former psychiatrist.  (R. 296).

Later that day, Taharah told Angelica L. Harrell, M.D. ("Dr. Harrell"), that he was on pension and could not find a job that making it worth giving up his stipend." (R. 295).  She noted that his affect was restricted and he was preoccupied with victim role.  (R. 295).  Dr. Harrell assigned

23

Taharah a GAF score of 50.  (R. 295).  Taharah's hepatitis C remained inactive.  (R. 295).  Later that month, Taharah told Mohammad R. Khoshnevis, M.D. ("Dr. Khoshnevis"), that he was doing fine on the current regimen of Ritalin, and stated that a single Ritalin is better than two of Ritalin per day. (R. 294).

In September 2003, Charlotte J. Friend, R.D. ("Friend"), a registered dietician at the VA Hospital, wrote in a Nutrition Intervention note that Taharah was angry that the clinic would not supply Ensure Plus to him.  (R. 298).  Friend noted that he was not cooperative with his weight-gain treatment plan.[24]  (R. 298).  She remarked that Taharah recently tested positive for hepatitis C but he did not cite it as a health issue.  (R. 298).  That same day, Taharah met with Hyesoo Lowe-Shin, M.D. ("Dr. Lowe-Shin"), who specializes in internal medicine at the VA Hospital.  (R. 299).  Dr. Lowe-Shin noted that Taharah complained of being tired all the time and had narcolepsy, which was well controlled with Ritalin.  (R. 299).  It was reported that Taharah had anorexic side effects from the Ritalin; as a result, he only eats one meal a day because he was "simply unable to eat."  (R. 299). Dr. Lowe-Shin's reported that Taharah had gained almost 5 pounds since June 2003, and his

---

[24]"I suggested he look into purchasing [Ensure] . . . nevertheless, [he was] angry that the facility has denied him the supplement in the past . . . [Patient] refuses to drink milk [for weight gain], as . . . he had a problem [with] kidney stones.  I told him 1-2 cups milk per day may not be problematic . . . . [Taharah] states he drinks 1-2 cups coffee daily, and an occasional soda that is high in caffeine levels . . . BMI reflecting low but healthy weight range . . . [Patient] is seeking Ensure Plus because of his anorexia, but criteria for dispensing are not met . . . I was met [with] anger.  [Patient] believes firmly that he is entitled to anything he may need from us . . . He is not willing to 'push' himself to consume more food because he needs it; he is unwilling to drink milk.  He will not try to purchase equivalent products on the market . . . stating he has too limited funds to live on; he has a room or suite of rooms at the DeGeorge Hotel Facility for homeless [veterans].  He says his funds are inadequate for groceries as is . . . A [n]utrition supplement is not indicated at this time.  [Patient] needs to work with conventional diet first . . . [Patient] left this interview in anger." (R. 298).

depression was stable.  (R. 299).  Later that month, Dr. Busch noted that Taharah was depressed and listed him with a diagnosis of major depressive disorder.[25]  (R. 378).

In October 2003, Taharah told Azzie Watts ("Watts"), a social worker at the VA Hospital, that he was interested in the vocational rehabilitation program in order to go back to school. (R. 303).

In November 2003, notes from a Psychiatric Review Technique Form completed by a Disability Determination Services physician indicated that the "alleged limitation caused by his symptoms of dep[ression]/anxiety/PTSD and memory loss are not fully supported by the [medical record]."  (R.170, 182).  Another Disability Determination Services physician, John R. Wiley, M.D. ("Dr. Wiley"), determined that Taharah's narcolepsy was a "non-severe impairment" and noted on a Case Assessment Form that Taharah was a "man with narcolepsy which is very well controlled by medication (Ritalin)."  (R. 169).

In December 2003, Taharah participated in a Neuropsychological and General Diagnostic Evaluation conducted by psychologist Paula J. Haymond, Ed.D. ("Dr. Haymond").  (R. 417-424). Taharah had been referred to Dr. Haymond by the VA in order to access, among other things, Taharah's "motivation for employment, psychological and academic levels of functioning" along with the "appropriateness of vocational rehabilitation services, [and] the level of support necessary for successful employment and recommendations."  (R. 417).  Taharah stated that at that time, he was rated by the VA as 100% disabled: 10% non-service-connected insomnia, which had changed

_____

[25] " Major depressive disorder" denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any  history of  manic, mixed,  or hypomanic episodes. *See* DORLAND'S, *supra*, at 530.

to a diagnosis of "psychoneurosis;" 0% for PTSD; 50% for depression; and 40% service-connected

narcolepsy.  (R. 418).  When asked about his diagnosis of PTSD, Taharah related the following:

> [W]hile he was in the military, at MP school in Fort Gordon, Georgia in 1974, his
> African American Sergeant was found mutilated with parts of his body being found
> in the barracks and parts of his body found in the woods next to the Fort.  Tariq
> stated that he was immediately separated from his unit and instead of actually
> attending MP classes, he was moved around the base to do a variety of labor-oriented
> jobs.  He [was] then processed for separation on the day of graduation from AIT with
> no explanation for his Honorable Discharge.  Tariq stated that he did not request
> discharge nor was it mandatory.  Tariq stated that he was terrified that he would end
> up dead in the woods like his former Sergeant.  No one was held accountable for
> Sergeant Cherry's death.

(R. 418).  The overall results of the evaluation suggested that Taharah was "functioning within the

average range of intelligence with comparable achievement scores" but stressed that "[t]he test

results and the interpretations should be taken in the larger context of other clinical, medical, and

developmental information."  (R. 423).  Dr. Haymond reported that Taharah was apt to over react

to stress and his relationships with authority figures could be best be described as hostile-dependant.

(R. 424).  Dr. Haymond further noted that as external stressors increase, he was apt to experience

a wide variety of somatic complaints that appear and disappear without awareness of how they are

associated with day-to-day stressors.  (R. 424).  Dr. Haymond diagnosed Taharah with chronic

PTSD, moderate major depressive disorder, narcolepsy, primary insomnia, and cognitive disorder,

NOS.[26]  (R. 424).  She noted that Taharah had passive aggressive personality features, and his

---

[26]"Cognitive disorder" is a category is for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in the delirium, dementia, and amnestic and other cognitive disorders section of DSM-IV-TR.  *See* DSM-IV-TR, *supra*, at 179.

psychological and environmental stressors included unemployment, financial difficulties, and no outside support system. (R. 424).  Dr. Haymond assigned Taharah a GAF score of 35-40.[27] (R. 424).

Three days later, Taharah saw Philip Alapat, M.D. ("Dr. Alapat"), at the VA Hospital, at which time Dr. Alapat advised Taharah had tested positive for exposure to tuberculosis ("TB").[28] Taharah, however, did not want to take the antibacterial medication, Isoniazid, because he feared it would bring about drug-induced hepatitis.  (R. 325).  Dr. Alapat recommended that Taharah take the medication to avoid the progression to active TB, but Taharah declined.  (R. 325).  Dr. Alapat concluded by noting he would ask Taharah to be scheduled by the sleep clinic, as he had no follow up with them to continue to treat his narcolepsy."  (R. 325).

Six days later, Taharah advised Dr. Harrell that his mood fluctuated mostly because of circumstances:  he was fighting for benefits and sad that he lived on such strained finances.  (R. 327).  Taharah remained on Concerta and requested a refill of Temazepam[29] because it helped him sleep without feeling hung over, but Dr. Harrell continued him on the antidepressant Mirtazipine because the sleep center doctors had not approved Temazepam.  (R. 327).  The sleep center had recommended against using sedatives as they may worsen his narcolepsy.  (R. 327).  Taharah reported that he was estranged from his kids and wife because he felt that being without money he

---

[27]A GAF rating of 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* DSM-IV-TR, *supra*, at 34..

[28]"Tuberculosis" is a specific disease caused by infection with *Mycobacterium tuberculosis*, the tubercle bacillus, which can affect almost any tissue or organ of the body, the most common seat of the disease being the lungs. *See* STEDMAN'S, *supra*, at 1889.

[29]"Temazepam" is indicated for the short term treatment of insomnia, generally 7-12 days.  *See* PDR, *supra*, at 1860.

had no need to be around them.  (R. 327).  Dr. Harrell diagnosed him with depression nos with more

dysthymia than major depressive disorder.  (R. 327).

In February 2004, Dr. Busch reported that Taharah appeared euthymic, and he listed

Taharah's diagnoses as major depressive disorder and narcolepsy.  (R. 376).  Dr. Busch further noted

that Taharah had attention deficit hyperactivity disorder ("ADHD").[30]  (R. 376).  In that same month,

Dr. Busch wrote a letter to the VA reporting that Taharah had been diagnosed with major depressive

disorder, secondary to his service-connected narcolepsy.  (R. 416).  Dr. Busch further opined that,

as a result of these illnesses, Taharah would not be able to secure gainful employment now or in the

future.  (R. 416).

In March 2004, Taharah again visited with Dr. Harrell at the VA Hospital.  (R. 333).  He

reported that things were "status quo right now," although his mood fluctuates.  (R. 333).  Dr. Harrell

noted that Taharah was mostly euthymic, and that Taharah felt his social situation was what was

affecting his mood most.  (R. 333).

In May 2004, Leela C. Reddy, M.D. ("Dr. Reddy"), of the SSA, determined that Taharah's

alleged impairments were not severe.  (R. 336).  According to Dr. Reddy, Taharah suffered from

dysthymia, and the restrictions on his daily activities and difficulties in social functioning,

concentration, persistence, or pace were all mild.  (R. 339, 346).  Dr. Reddy further noted that the

evidence did not establish the presence of the affective disorders criteria.  (R. 347).  Dr. Reddy

---

[30]"Attention Deficit Hyperactivity Disorder" or "ADHD" is a childhood mental disorder
characterized by inattention (such a distractibility, forgetfulness, not finishing tasks, and not appearing to
listen), by hyperactivity and impulsivity (such as fidgeting and squirming, difficulty in remaining seated,
excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn, interrupting others,
and excessive talking) or by both types of behavior.  Onset is before age seven but it can persist into
adulthood.  *See* DORLAND'S, *supra*, at 528.

concluded by noting that Taharah's alleged limitations were not supported by the electronic outbound requests.  (R. 348).

In May 2004, Terry Collier, M.D. ("Dr. Collier"), with the SSA, completed a Case Assessment Form, noting that Taharah's narcolepsy was well controlled with Ritalin, his hepatitis C was asymptomatic, and the alleged limitations were not fully supported by the medical evidence of record in file.  (R. 350).  Thereafter, Taharah met with Minh Tran, M.D. ("Dr. Tran"), a physician at the VA Hospital.  (R. 410).  Dr. Tran noted that Taharah either had narcolepsy or idiopathic hypersomnia,[31] and he may require scheduled naps.  (R. 410).  Taharah also visited with Dr. Lowe-Shin at the VA Hospital, and expressed concern over his unintentional weight loss.  (R. 406).

In June 2004, Amir Sharafkhaneh, M.D. ("Dr. Sharafkhaneh"), of the VA Hospital, noted in a Sleep Center Polysomnography Report that Taharah had a diagnosis of narcolepsy from an outside facility with a final diagnosis of atypical narcolepsy—*i.e.*, narcolepsy without cataplexy. (R. 403).  Later that month, Taharah met with Drs. Sharafkhaneh and Tran at the VA Hospital.  (R. 402).   The doctors diagnosed Taharah with atypical narcolepsy as opposed to idiopathic hypersomnia.  (R. 402).  Taharah claimed he became drowsy around noon.  (R. 402)  Taharah's doctors, Sharafkhaneh and Tran, discussed changing Taharah's medication regimen.  (R. 402).  The next day, Taharah and registered dietician, Friend, discussed ways to increase his daily calorie intake. (R. 396).  Taharah reported that he was taking in more calories.  (R. 396).  He had gained 3 pounds, and Friend noted that his body mass index was in the low but healthy range.  (R. 397).  The next day,

---

[31]"Idiopathic hypersomnia" is similar to atypical narcolepsy in that there is no cataplexy; however, idiopathic hypersomnia differs from atypical narcolepsy in that people with idiopathic hypersomnia have normal distributions of rapid eye movement (REM) and non-rapid eye movement (NREM), while people with narcolepsy have recurrent intrusions of elements of REM sleep into the transition between sleep and wakefulness and the presence of multiple sleep-onset REM periods.  The two disorders are distinguished based on distinctive clinical and laboratory features.  *See* DSM-IV-TR, *supra,* at 606-608.

Taharah met with Dr. Harrell at the VA Hospital and reported that he was now considered 100% service-connected disabled by the VA.  (R. 394).  Dr. Harrell assessed him with dysthymia - stable but anxious, and increased his dosage of Remeron.  (R. 394).

In August 2004, Taharah visited with Lara Bashoura, M.D. ("Dr. Bashoura"), at the VA Hospital.  (R. 393).  Dr. Bashoura noted that Taharah's insomnia was not related to narcolepsy.  (R. 393).  Five days later, Dr. Busch reported that Taharah claimed he was alert, but still unable to accomplish tasks.  (R. 375).  Dr. Busch observed that Taharah appeared euthymic, and listed Taharah's diagnoses as major depressive disorder, narcolepsy, and ADHD.  (R. 375).

In October 2004, Dr. Busch reported that Taharah was depressed and anxious and listed Taharah's diagnoses as major depressive disorder, PTSD, and narcolepsy.  (R. 374).

In November 2004, Taharah met with psychiatrist Jane Jee Sun Kang, M.D. ("Dr. Kang"), at the VA Hospital, for individual psychotherapy with evaluation and management.  (R. 390).  Dr. Kang noted that Taharah had a history of depression and dysthymia.  (R. 390).  Dr. Kang noted that Taharah acknowledged a baseline depression (dysthymia) that is situational.  (R. 390).  Dr. Kang's impression was that Taharah was a chronic dysthymic with a history of double depression. [32] (R. 390).  Dr. Kang reported that Taharah's symptoms were mild and related to psychosocial events.  (R. 390).  Dr. Kang referred Taharah to group therapy for his situational dysthymia.  (R. 382, 390).  Taharah stated that he continued to have sleep difficulties due to his sleep disorder.  (R. 390).

---

[32] After the initial 2 years of the dysthymic disorder, major depressive episodes may be superimposed on the dysthymic disorder.  In such cases, "double depression" (*i.e.*, both major depressive disorder and dysthymic disorder) is diagnosed. *See* DSM-IV-TR, *supra,* at 377.

In December 2004, Taharah again met with Dr. Bashoura at the VA Hospital. (R. 389). Dr. Bashoura noted that Taharah had recently stopped taking Modafinil[33] because it reportedly made him nauseous, but he was doing well on Ritalin. (R. 389). At that time, his chief complaint was loss of appetite. (R. 389). The next day, Dr. Busch observed that Taharah appeared anxious, and he listed Taharah's diagnoses as major depressive disorder, PTSD, and narcolepsy. (R. 373).

In January 2005, Taharah visited Michael McClam, M.D. ("Dr. McClam"), at the VA Hospital, and advised Dr. McClam that he had quit smoking for twenty (20) days and that his mood was "fine." (R. 382). In February 2005, Dr. Busch reported in his treatment notes that Taharah appeared "euthymic," but he did not list him as depressed. (R. 372).

In April 2005, Taharah met with Radha M. Rao, M.D. ("Dr. Rao"), at the VA Hospital. (R. 362). Dr. Rao reported that Ensure had helped Taharah gain 15 pounds, and Taharah's mental health status was stable. (R. 362-363). According to Dr. Rao, Taharah's narcolepsy symptoms also had improved. (R. 363).

In May 2005, Dr. Alapat noted that with Taharah's current medication regimen of Ritalin and Restoril,[34] Taharah was able to function adequately during the day and sleep adequately at night. (R. 361). It was further noted that Taharah was taking Megace[35] to counter the loss of appetite associated with Ritalin. (R. 361). Taharah denied any current cataplexy or sleep paralysis and stated that he felt that he was doing well overall. (R. 361). Taharah denied any sleepiness while driving. (R. 361).

---

[33]"Modafinil" is indicated to help improve wakefulness in patients with excessive sleepiness associated with narcolepsy, obstructive sleep apnea/hypopnea syndrome, and shift work sleep disorder. *See* PDR, *supra*, at 990.

[34]"Restoril" is indicated for the short-term treatment of insomnia. *See* PDR, *supra*, at 1860.

[35]"Megace" is indicated for the treatment of anorexia. *See* PDR, *supra*, at 2482.

Additionally, in May 2005, Taharah met with nurse C. Smith at the VA Hospital.  (R. 360).
Taharah told C. Smith that he had no history of falling, and she noted that he was oriented.  (R. 360).
Taharah also met with Dr. McClam for individual psychotherapy with evaluation and management.
(R. 354).  Taharah claimed that he was feeling well overall although he still had some difficulty with
fatigue and anorexia; overall, however, he reported the medication was helpful in managaing his
narcolepsy.  (R. 354).  It was reported that Taharah's appetite was better and his weight was
stabilizing on his current regimen.  (R. 354).  Dr. McClam's impression was that Taharah had
depression, narcolepsy, and an addiction to nicotine and caffeine.  (R. 355).  Taharah next met with
Dr. Rao who noted Taharah's successful weight gain and the improvements in his mental health and
narcolepsy symptoms.  (R. 355-356).

In June 2005, Dr. Busch diagnosed Taharah with major depressive disorder, PTSD, and
narcolepsy.  (R. 381).  Taharah's mood was described as "[e]uthymic, [d]epressed," while his affect
was noted as "congruent to mood."  (R. 381).

In July 2005, Robert W. Fayle, M.D. ("Dr. Fayle"), who practices neurology and sleep
medicine, reported in a letter to Dr. Busch that he had re-evaluated Taharah.  (R. 435).  Dr. Fayle
recommended that Taharah's medical regiment be changed significantly because, although Taharah's
cataplectic events had decreased significantly, he had historical suggestion of both narcolepsy and
cataplexy.  (R. 435).  Dr. Fayle opined that the changes would effectively and efficiently consolidate
nocturnal sleep and may allow him better daytime alertness and more consistent nocturnal sleep.
(R. 435).  Dr. Fayle's impressions included both narcolepsy-cataplexy with partial response to
current medications and insomnia.  (R. 436).

Dr. Fayle also sent a letter to Jim Roos ("Roos"), a National Services Officer at the VA Regional Office.  (R. 438-439).  Dr. Fayle noted that he had first evaluated Taharah in 1994, during which time he was diagnosed with sleep apnea[36] and, through sleep latency tests, narcolepsy. (R. 438).  Dr. Fayle's impression was that Taharah had clearly identifiable cataplectic events, which went back for 20 years prior to the study.  (R. 438).  Although it was shown in a June 2004 study at the VA Hospital that Taharah had some partial improvement with medication, Dr. Fayle reported that Taharah was still excessively sleepy.  (R. 438).  Dr. Fayle opined that Taharah has long standing narcolepsy-cataplexy that certainly was apparent during his enlistment and possibly present prior to his enlistment in the Army.  (R. 439).  Dr. Fayle's neurology consultation notes indicated that Taharah's past medical history is important for narcolepsy, insomnia, major depression disorder and posttraumatic stress disorder.  (R. 440).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical,

---

[36]"Sleep apnea" refers to "transient periods of cessation of breathing during sleep." *See* DORLAND'S, *supra,* at 114.

laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.

It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, the Commissioner's decision is not supported by substantial evidence.  As an initial matter, the ALJ improperly discounted the opinions of Taharah's treating physician, Dr. Busch, without sufficient rationale and/or explanation as set forth by 20 C.F.R. § 404.1527.  Instead, the ALJ noted that no treating or examining physician had indicated that Taharah was disabled and that the ALJ was charged with resolving conflicts in the medical evidence and medical opinions.  (R. 19).  Here, the ALJ failed to discuss evidence in record which contradicted his decision and took evidence out of context.  (R. 19-20).  Indeed, in assessing the limitations that stem from Taharah's narcolepsy and depression, the ALJ inappropriately isolated from the VA record those portions which reflected that his condition had stabilized at given moments, questioned the validity of the PTSD diagnosis, and noted one examiner's opinion that Taharah's symptoms seemed "magnified and exaggerated." (R. 21, 277, 282, 285, 357, 374, 376, 380).

A more thorough review of the VA treatment notes and the medical records, however, reveals that Taharah's narcolepsy symptoms and depression were more often found to be uncontrolled, and that he had severe functional limitations consistent with "moderate" to "severe" limitations in social

and/or occupation function, given that he was assessed with GAF scores no higher than 55 and as low as 35 over the several years of his ongoing treatment.  (R. 216, 217, 245, 256, 257, 262, 269, 285, 291, 295, 309, 424).  The ALJ failed to acknowledge those GAF assessments, and the numerous indications in the VA treatment notes that Taharah's daytime sleepiness, insomnia, and depression were not under control.  *See Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (a GAF score is not a determiner of an ability to work; however, it should be considered as part of the medical evidence).   This type of selective review of the record has been expressly renounced by the Fifth Circuit.   "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Loza*, 219 F.3d at 393.

Furthermore, additional evidence submitted at the Appeals Council level of review (*i.e.*, opinion letter from Dr. Busch) appears to have gone unnoticed by the Appeals Council.  (R. 4-7).  In the letter, Dr. Busch affirmed his treatment of Taharah since August 2002 for what he had diagnosed as major depressive disorder, secondary to service-connected narcolepsy.  (R. 416).  Dr. Busch opined that due to the "severity and progression of his illness, [Taharah] will be unable to secure gainful employment now or in the future."  (R. 416).  Despite the uncontradicted record in this regard, the Appeals Council neither mentioned in the substance of its denial nor was the letter listed in its list of additional evidence.  (R. 4-7).

Similarly, the Appeals Council appears to have given no weight to the report from examining psychologist Dr. Haymond.  (R. 417-423).  Dr. Haymond concluded that Taharah suffers from PTSD, major depressive disorder, narcolepsy, primary insomnia, cognitive disorder, and passive aggressive personality features such that his GAF rating was no higher than 40, indicating a major impairment.  (R. 417-423).  In support of her diagnoses, Dr. Haymond performed an extensive

35

battery of standardized psychological testing, in addition to her own mental status examination. Although Dr. Haymond's report is unrebutted, the Appeals Council, while acknowledging the receipt of this evidence in an attachment to its denial letter, did not explain its basis for not giving the reports some weight.

In sum, the record contains no findings from either a treating or examining medical source which are inconsistent with those of Drs. Busch and Haymond, the only two sources to have rendered opinions as to the functional impact of Taharah's impairments. Because the ALJ and the Appeals Council discounted the opinions of Taharah's treating and/or examining physicians without sufficient explanation, the Commissioner's decision is not supported by substantial evidence and must be remanded for a proper examination of the evidence. It may be of benefit to the ALJ to have a medical expert present at any new administrative hearing to review and evaluate the medical evidence.

## 2.      *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v.*

*Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth

Circuit recognizes that the ALJ is best positioned to make these determinations because of the

opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he

Act, regulations and case law mandate that the Secretary require that subjective complaints be

corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481

(5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d

1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895

F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does

not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267,

1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally,

the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*,

887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial

evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269

F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly

unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*,

925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is

disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at

128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as

inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir.

2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

Subjective complaints are not exclusive to symptoms associated with pain. *See* 20 C.F.R. § 404.1529(a) (symptoms include pain, fatigue, shortness of breath, weakness, or nervousness). In his decision, the ALJ acknowledges that Taharah has narcolepsy; however, he contends that Taharah has exaggerated the effects of his narcolepsy. (R. 20). Inexplicably, the ALJ opined that the "[m]edical records reveal no medication side effects were reported by the claimant." (R. 21).

Contrary to the ALJ's determination, the medical records are replete with treatment notations regarding side effects from Taharah's medications, including excessive daytime sleepiness, drowsiness, insomnia, lack of appetite, and depression. (R. 196, 197, 199, 204-205, 208-214, 219, 221-224, 226-227, 241, 245, 248, 253, 274, 285, 287, 293-294, 299, 307, 311-312, 315, 317, 354, 361, 389-390, 393, 397, 402, 406, 438, 457, 459-460, 462-463). The treatment notes reflected that Taharah took several different medications to attempt to manage his narcolepsy, insomnia, and depression. (R. 216, 223, 248, 254, 256, 261, 272, 285, 307, 329, 351, 355, 357, 361, 378, 382-384, 386, 389, 402). Although, at times, the record vacillated as to the side effects Taharah experienced from the medications, in his decision, the ALJ neither made mention of the numerous medications taken by Taharah, nor the impact of such side effects. *See* 20 C.F.R. § 404.15292(c)(3)(iv).

Because Taharah is required to take several medications, many of which have known side effects of drowsiness, sleepiness, daytime sedation and/or decreased appetite, the ALJ should have taken into consideration possible medication side-effects and any impact such medications might have had on Taharah. *See Loza*, 219 F.3d at 397 (history of claimant's extensive medical treatment with anti-psychotic and other mood altering medications indicated presence of disabling mental illness and possibility of medication side effects that could render claimant disabled or at least contribute to disability). The ALJ erred by failing to make such an evaluation. Upon

38

remand, the effect of medication side-effects should be considered in evaluating Taharah's credibility.

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for his, or whether he would be hired if he applied for work . . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. §§ 404.1545, 416.945. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223,

1225 (5th Cir. 1986); *see also* 20 C.F.R. §§ 404.1545, 416.945.  When a claimant's residual

functional capacity is not sufficient to permit him to continue his former work, then his age,

education, and work experience must be considered in evaluating whether he is capable of

performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a

vocational expert is valuable in this regard, as "he is familiar with the specific requirements of a

particular occupation, including working conditions and the attributes and skills needed." *Fields v.*

*Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v.*

*Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR").  *See Myers,* 238 F.3d

at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)).  The Social

Security Administration's rulings are not binding on this court, but they may be consulted when the

statute at issue provides little guidance. *Id.*  In *Myers*, the Fifth Circuit relied on SSRs addressing

residual functional capacity and the interplay of exertional and nonexertional factors. *See id*.  In that

case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment
> of an individual's ability to do sustained work-related physical and mental activities
> in a work setting on a regular and continuing basis."  "A 'regular and continuing
> basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
> "The RFC assessment is a function-by-function assessment based upon all of the
> relevant evidence of an individual's ability to do work-related activities." "However,
> without the initial function-by-function assessment of the individual's physical and
> mental capacities, it may not be possible to determine whether the individual is able
> to do past relevant work. . . ."  RFC involves both exertional and nonexertional
> factors.  Exertional capacity involves seven strength demands:  sitting, standing,
> walking, lifting, carrying, pushing, and pulling.  "Each function must be considered
> separately." "In assessing RFC, the adjudicator must discuss the individual's ability
> to perform sustained work activities in an ordinary work setting on a regular and
> continuing basis. . . ."  The RFC assessment must include a resolution of any
> inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)).  The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.*  Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment. *See Watson*, 288 F.3d at 218; *Singletary*, 798 F.2d at 821; *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform.  *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)). Nevertheless, " use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.' " *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza*, 219 F.3d at 398; *Newton*, 209 F.3d at 458.   If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.  *See id.*  Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.  *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

41

Here, Taharah suffers from exertional and nonexertional impairments (*i.e.*, mental impairments); thus, it was proper for the ALJ to rely on a vocational expert to establish that suitable jobs exist in the economy. *See Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza*, 219 F.3d at 398; *Newton*, 209 F.3d at 458.

In the case at bar, based on the testimony of the VE, the ALJ concluded:

> The claimant has the residual functional capacity to perform a light level of work activity.  Specifically, the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently with a sit/stand option and the ability to walk 4 to 8 hours.  The ability to push and pull is unlimited.  Gross dexterity is unlimited but fine dexterity is limited.  The claimant retains the ability to relate to others, to understand simple instructions, concentrate on and perform simple tasks and respond to workplace changes and supervision.  However, the claimant should have limited employee/customer contact.

(R. 23).   The ALJ, however, failed to formulate hypothetical questions for the VE that encompassed all of Taharah's recognized limitations.   The ALJ posed the following questions to the VE:

> Q:      . . . Assume a younger individual with a high school education, a GED, ability to lift occasionally, 20 pounds, 10 pounds frequently.  Ability to sit, stand, or walk, sit/stand –excuse me, sit/stand option with the ability to walk four to eight hours in a day.  The push/pull ability is not impacted, is unlimited.  Gross dexterity is fine in both left and right.  Fine dexterity is limited.   Can relate to others and has ability to understand simple instructions, concentrate on and perform simple tasks, however limited employee or customer contact.   Has the ability to respond to workplace changes and to supervision.   Based on that proposed hypothetical, are you able to make a conclusion as to whether the claimant would be able to perform his past work?
>
> A:      Yes, Your Honor.
>
> Q:      And what is that conclusion?
>
> A:      He would not be able to.

> Q:     Okay.  Based on his inability to perform his past work, do you – are you able to determine if there are any other jobs in the regional or local economy which he could perform?
>
> A:     Yes, Your Honor.  The skills would not transfer to this hypothetical, but this would allow for essentially 30 percent of the light unskilled jobs noticed by the Commissioner.
>
> Q:     And what would those specific job be?
>
> A:     These would include jobs such as a mail clerk, a parking lot attendant, or an electronics worker.  These are light, unskilled occupations, Judge.

(R. 479-480).  When the ALJ asked whether, using the same hypothetical, but with Taharah's testimony as full and credible, would the VE be able to make a determination as to Taharah's ability to perform any type of work in the national economy, the VE responded that it "would not be consistent with competitive employment at any level of exertion."  (R. 481).

Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, may an ALJ properly rely on the VE's testimony and conclusion.  *See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  Unless there is evidence in the record to adequately support the assumptions made by a VE, the opinion expressed by the VE is meaningless.  *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, the ALJ failed to formulate a hypothetical question to the VE that incorporated side effects from Taharah's medication (*e.g.*, excessive daytime sleepiness, insomnia, decreased appetite, and depression) and/or the full spectrum of Taharah's mental limitations.  Because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite Taharah's impairments, there are other jobs existing in significant numbers in the national economy that he could perform, consistent with his mental and physical residual functional capacity.  As such, the case must be remanded.

**4.** ___***Failure to Properly Evaluate VA Disability Determination***

Although "[a] VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, . . . it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss,* 269 F.3d at 522 (citing *Loza*, 219 F.3d at 394); *see also Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981).

Here, at the administrative hearing, the ALJ did not address Taharah's VA disability determination except in passing:

> ALJ:  Okay.  Were you fired from that job or did you leave that job?
>
> Taharah:  I wasn't fired.  I was suspended . . . [T]he VA, Your Honor, once they diagnosed me and examined me, they classified me as disabled, unable to work, unable to operate equipment . . . I wanted to go back to work irregardless to what they said, but they said I couldn't perform that – no longer perform my duties at that job . . . .
>
> ALJ:  Now, do you have any income currently?
>
> Taharah:  I am [a] disabled Veteran.  Yes, Your Honor.
>
> ALJ:  What is your current income?
>
> Taharah: $2,400 per month.

(R. 468).  In his decision, the ALJ acknowledged that the VA had rated Taharah as 100% disabled. (R.19).  Notwithstanding, it is unclear from the ALJ's decision whether the VA rating was giving any consideration; instead, the ALJ merely recited that the VA's findings are not binding on the SSA. (R. 19).  While not binding on the Commissioner, the VA's findings regarding Taharah's disability determination are entitled to a certain amount of weight.  *Chambliss*, 269 F.3d at 522. Despite the fact that Taharah had a 100% VA disability rating, there is no evidence that this rating

was considered much less scrutinized by the ALJ.  As such, this case must be remanded for the ALJ to afford the VA disability rating the proper evaluation and/or consideration.  *See Rodriguez*, 640 F.2d at 686 ("[a] VA rating of 100% disability should have been more closely scrutinized by the ALJ").

### III.   *Conclusion*

Accordingly, it is therefore

**ORDERED** Plaintiff's Motion for Summary Judgment (Docket Entry No. 9) is **GRANTED**. It is further

**ORDERED** that the Defendant's Motion for Summary Judgment (Docket Entry No. 10) is **DENIED**.  It is finally

**ORDERED** that the case is **REVERSED** and **REMANDED**, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to properly consider, if necessary by a medical doctor, the severity of Taharah's alleged narcolepsy and mental impairments, to evaluate the opinions of Taharah's treating and examining physicians, to incorporate Taharah's alleged mental and physical functional limitations in a hypothetical question to the VE, to develop clear testimony from a VE regarding jobs, if any, Taharah is capable of performing considering all of his limitations, to consider Taharah's medications in his RFC and credibility assessments, and to properly weigh the VA's disability rating.

**SIGNED** at Houston, Texas on this the 29th day of February, 2008.

Calvin Botley
United States Magistrate Judge